COMMONWEALTH *vs.* JACK JACOBS
(and five companion cases[1]).

Suffolk.   December 3, 1962. — July 2, 1963.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, KIRK,
SPIEGEL, & REARDON, JJ.

*Search and Seizure.  Constitutional Law,* Search and seizure.  *Evidence,* Competency, Illegally seized material.  *Practice, Criminal,* Exceptions: renewal of exception, whether error harmful.  *Error,* Whether error harmful.

A search warrant for "obscene, indecent or impure" publications at certain premises, expressed in terms merely abbreviating the general language of G. L. c. 276, § 1, Eighth, and not specifying any particular publications to be seized at such premises, although the court clerk issuing the warrant had been shown some publications, was invalid on its face as leaving too much to the discretion of the officers using it, and publications seized pursuant thereto should have been suppressed upon motion preceding trial of indictments against an occupant of the premises for violations of c. 272, §§ 28A, 28B.  [303, 307–308]  KIRK, J., dissenting.

───────

[1] Three indictments (Nos. 198, 199, and 202) were against Jacobs.  The other indictments (Nos. 200, 201, and 203) were against Interstate Newsdealers Supply, Inc.  Four indictments under § 28A were each in twenty-five counts.  Two indictments (Nos. 202, 203), alleging violations of § 28B, were each in four counts.

At the trial of indictments against an occupant of premises for violations
of G. L. c. 272, §§ 28A, 28B, evidence of the procedures followed in
searching the premises and seizing a large quantity of publications
therein by police officers, who showed a search warrant to the defendant
expressing only in the general language of c. 276, § 1, Eighth, as
amended, the publications to be seized and not referring to any specific
items, although the court clerk issuing the warrant had been shown cer-
tain items, and who examined some but not all of the publications seized
and consulted with their captain by telephone and did not arrest the
defendant, required a conclusion that the search and seizure were un-
reasonable and illegal. [308–310]  KIRK, J., dissenting.

Where the defendant in a criminal case filed a motion in advance of trial
for the suppression of alleged illegally seized evidence, and, following
denial of the motion and exception to the denial, asked leave to renew
the motion at the outset of the trial, failure on his part to specifically
object to the introduction of such evidence when it was offered at the
trial was not fatal to a preservation of his rights with respect thereto.
[310–311]

Coöperation with police searching certain premises by the occupant
thereof, who was shown a search warrant when the police first entered
the premises and thereupon made certain statements as to the nature of
certain publications there, did not render publications illegally seized
there admissible against him at a subsequent criminal trial based on his
possession thereof.  [311]  KIRK, J., dissenting.

At the trial together of indictments having many counts, upon all of which
the defendant was convicted, charging violations of G. L. c. 272, § 28A,
by possession of obscene publications and of § 28B by certain deliv-
eries of obscene publications to a retailer, where publications which
were seized illegally at the defendant's premises and were the subject of
counts under § 28A only were erroneously admitted in evidence gener-
ally with respect to all counts of all the indictments, reversal of all
judgments of conviction, entry of judgments for the defendant upon the
indictments under § 28A, and further proceedings upon the indictments
under § 28B were required.  [311–312]  KIRK, J., dissenting.

SIX INDICTMENTS found and returned on January 6, 1961.
In the Superior Court, certain motions were heard by
*Smith, J.,* and the indictments were tried before *Good, J.*

*William P. Homans, Jr. (Harold Katz & Sumner Z. Kap-
lan* with him) for the defendants.

*Joseph R. Nolan,* Assistant District Attorney (*Newman
A. Flanagan,* Assistant District Attorney, with him), for
the Commonwealth.

*Reuben Goodman, James M. Harkless, & Daniel D. Lev-
enson,* for Civil Liberties Union of Massachusetts, amicus
curiae, submitted a brief.

Commonwealth v. Jacobs.

CUTTER, J. The defendants were indicted for violation of G. L. c. 272, § 28A (as amended through St. 1959, c. 492, § 2),[2] and § 28B (as amended through St. 1960, c. 311).[3] Jacobs was the active manager of Interstate Newsdealers Supply, Inc. (Interstate).

Each count under § 28A charged the defendant with possession (Nos. 198, 200) for purposes of sale of a particular pamphlet, or with importation (Nos. 199, 201) of a particular pamphlet. Each count under § 28B charged that the defendant on a stated date in October or November, 1960, "being a wholesale distributor, did . . . deliver to one . . . Baker, a retail storekeeper" a particular pamphlet, magazine, or printed item[4] "knowing it to be obscene . . . the . . . storekeeper not having previously ordered in writing such pamphlet, magazine and printed material, specifying the title and quantity of such publication desired."

The indictments were returned on January 6, 1961. Trial took place on May 24 to May 31, 1961,[5] under G. L. c. 278, §§ 33A–33G, inclusive, as amended. There were verdicts

[2] "Whoever imports . . . sells or distributes a pamphlet . . . or other thing which is obscene, indecent or impure . . . or has in his possession any such pamphlet . . . or other thing, for the purpose of sale . . . or circulation, shall be punished by imprisonment in the state prison for not more than five years or in a jail or house of correction for not more than two and one half years, or by a fine of not less than one hundred dollars nor more than five thousand dollars, or by both such fine and imprisonment in jail or the house of correction." There was no indictment under G. L. c. 272, § 28 (as amended through St. 1959, c. 492, § 1), relating to sales of obscene materials to persons under the age of eighteen.

[3] "Whoever . . . being a wholesale distributor . . . sends or delivers to a retail storekeeper a book, pamphlet, magazine or other form of printed or written material, knowing it to be obscene, indecent or impure, which said storekeeper had not previously ordered in writing, specifying the title and quantity of such publication he desired, shall be punished" (same punishment as in § 28A, fn. 2, supra).

[4] Only three magazines and one paperback novel were involved in the indictments under § 28B. Each of these was also the subject of a particular count under § 28A. In addition there was, in each indictment under § 28A, a count with respect to each of thirteen other magazines and eight paperback novels.

[5] The trial was prior to our decision in Demetropolos v. Commonwealth, 342 Mass. 658, decided June 2, 1961. It was also prior to the decisions of the Supreme Court of the United States in Marcus v. Search Warrant of Property at 104 East Tenth St. Kansas City, Mo. 367 U. S. 717, and Mapp v. Ohio, 367 U. S. 643, both decided June 19, 1961. See also Manual Enterprises, Inc. v. Day, 370 U. S. 478, decided June 25, 1962, and Bantam Books, Inc. v. Sullivan, 372 U. S. 58, 63–72, 80, decided February 18, 1963.

of guilty against each defendant on each count. Each
defendant appealed and filed assignments of error.

The first assignment of error in each case relates to the
validity of a general search warrant. It is based upon the
denial of the defendants' motions, filed in advance of trial
in cases Nos. 199 and 200 (see fn. 9, *infra*), to quash the
indictments and to suppress the evidence obtained by the
use of the search warrant.[6] This warrant, a copy of which
was attached to each motion, was expressed in terms abbre-
viating the general language of G. L. c. 276, § 1, Eighth (as
amended through St. 1934, c. 303, § 2).[7] The grounds of
the motions were that "the warrant . . . was not issued
upon probable cause supported by oath . . ., the basis for
the oath of belief is not stated, and the warrant . . . is too
broad and fails to describe particularly the things to be
searched for and seized." See Fourth and Fourteenth
Amendments of the Constitution of the United States, and
Constitution of Massachusetts, Part 1, Declaration of
Rights, art. 14.[8]

These motions plainly were filed in "optimistic anticipa-

---

[6] The warrant recites that "John J. Murphy . . . has . . . on oath in-
formed the Municipal Court . . . that the following property . . . to wit:
*obscene, indecent or impure books, pamphlets, etc., manifestly tending to cor-
rupt the morals of youth,* for the purpose of exhibition or circulation, and
that the said informant believes that said property . . . is concealed in a . . .
house . . . [at 1080] Hyde Park Ave." (emphasis supplied). The warrant
then authorized the search for and seizure of "said property . . . or any part
thereof" and the taking of "the body of the person . . . in whose possession
found." Detective Murphy's return states that he "found printed papers
which the government alleges to be obscene, indecent or impure." The return
does not report any arrest of a person.

[7] Section 1, as so amended, reads, in part: "A court . . . may, upon com-
plaint on oath that the complainant believes that any of the property . . .
hereinafter named . . . [is] concealed in a particular . . . place, if satisfied
that there is reasonable cause for such belief, issue a warrant to search for the
following property . . . . Eighth, Books, pamphlets . . . and other things
containing indecent, impure or obscene language, or indecent, impure or ob-
scene prints, pictures, figures or descriptions manifestly tending to corrupt the
morals of youth, and intended to be sold, exhibited, loaned, circulated or dis-
tributed, or introduced into any family [or] school . . . ." General Laws
c. 218, § 33, provides: "A clerk [or] assistant clerk . . . may receive com-
plaints, administer . . . the oath required thereto, and issue warrants [and]
search warrants . . . ."

[8] See also *Jacobs* v. *Sullivan*, 193 F. Supp. 765 (D. Mass. 3 judge court), in
which these defendants attempted to obtain a Federal court injunction against
the prosecutions and the use of the documents. This was denied because of
failure to show any inadequacy of State remedies to protect their constitutional
rights.

tion'' (see *Dirring, petitioner,* 344 Mass. 522, 524) of the decisions of the Supreme Court of the United States in various cases, not then decided (see fn. 5, *supra*), especially the *Marcus* case, 367 U. S. 717, and the *Mapp* case, 367 U. S. 643. See *Commonwealth* v. *Spofford,* 343 Mass. 703, 706–708. The judge who heard the motions was not the judge who later presided at the trial of the indictments. Our then existing rule (see e.g. *Commonwealth* v. *Wilkins,* 243 Mass. 356) applicable to criminal proceedings would not then have supported the suppression or exclusion from evidence of the seized material. The defendants did all that they could reasonably have been required to do, in the then state of the Massachusetts law, to save their rights against the possibility of the later Supreme Court decisions.

The motions, although in name motions to quash, were in substance (see *Commonwealth* v. *Geagan,* 339 Mass. 487, 495) motions to suppress evidence seized under the general warrant (see fn. 6, *supra*). Viewed as motions to quash the indictments, the motions were properly denied. *Commonwealth* v. *Geagan,* 339 Mass. 487, 495. See *Costello* v. *United States,* 350 U. S. 359, 361–364; *Lawn* v. *United States,* 355 U. S. 339, 348–350; *Centracchio* v. *Garrity,* 198 F. 2d 382, 387–389 (1st Cir.); 8 Wigmore, Evidence (McNaughton rev.) § 2184a, p. 40. Viewed as motions to suppress seized documents, we must consider them in the light of the *Marcus* case, even though the motions were heard and the indictments were tried before that decision. *Commonwealth* v. *Spofford,* 343 Mass. 703, 706–707.

Each motion recited that Interstate occupied premises at 1080 Hyde Park Avenue, Boston, and that on December 2, 1960, certain books, pictures, magazines, articles, and similar materials were seized and taken from Interstate's premises upon the warrant, a copy of which was attached to the motions. No evidence was introduced at the hearing of the motions. Two arguments were made, viz., (1) ''that the warrant was improper, that the statute under which the warrant issued is unconstitutional, and, consequently, the search and seizure . . . is . . . illegal,'' and (2) that the judge ''should . . . determine that the evidence . . .

illegally seized should be quashed and not used as evidence in a criminal proceeding." These arguments were developed orally in considerable detail. The motions were denied before the trial commenced.[9]

The *Marcus* case dealt with a Missouri statute which permitted a search warrant[10] to be issued upon sworn, written complaint if the issuing officer "shall be satisfied that there is reasonable ground" therefor. If a judge, after a hearing, determines that material taken is obscene, such material is to be destroyed after its usefulness as "evidence in any criminal prosecution" has ended. In circumstances in many respects similar to those in the present case, the Kansas City police seized, upon a general search warrant, some 11,000 copies of 280 publications, from a wholesaler and from news stands (p. 723). Motions were filed "to quash the search warrants and to suppress as evidence the property seized" (p. 723). The judge "found that 100 of the . . . items were obscene" (p. 724) and ordered them destroyed. The Missouri Supreme Court sustained this action. In the Supreme Court of the United

---

[9] The judge heard the motions on April 6, 1961, and denied them on April 21, 1961. The dockets do not state that notice of this action was sent to counsel as was done in other places in the same docket. Counsel for the defendants has filed an affidavit that he first learned of the denial of the motions by inquiry at the clerk's office on May 18, 1961, and promptly saved exceptions. No argument is made by the Commonwealth that this was not the case or that the exceptions were not seasonable. In the circumstances, we treat the exceptions as seasonably claimed, and as action in advance of trial properly before us under G. L. c. 278, §§ 33A–33G. See *Commonwealth* v. *Geagan*, 339 Mass. 487, 494–502. Cf. *Commonwealth* v. *Gliniecki*, 339 Mass. 464, 466–467. At the hearing on the motions, counsel for the defendants pointed out that, although the motions were filed under only one docket number relating to each defendant, it was "under the assumption" that the ruling would "be determinative . . . because they all arise out of the same single search."

[10] Among the items which could be seized under such a warrant were any of "the following . . . kept . . . [to be] sold . . . or otherwise distributed . . . viz.: obscene, lewd . . . indecent . . . books, pamphlets . . . pictures . . . or other articles or publications of an indecent . . . character." The items in fact seized "included so-called 'girlie' magazines, nudist magazines, treatises and manuals on sex, [and] photography magazines" (p. 723, fn. 8). The full text of the warrants in the *Marcus* case does not appear in the opinion. The original papers show that a police lieutenant averred "of his own knowledge" that the wholesaler kept at specified premises "for the purpose of selling . . . or otherwise distributing . . . obscene, lewd, licentious, indecent, and lascivious books, pamphlets . . . pictures . . . and other articles or publications or [*sic*] an indecent, immoral and scandalous character." The warrants authorized the seizure of this property or any part of it but described the property only in the general terms set out in the complaint.

States Mr. Justice Brennan spoke for a court unanimous in striking down the Missouri procedures. Mr. Justice Black and Mr. Justice Douglas (at pp. 738–739) in a separate opinion relied primarily upon the fact that the "warrant used . . . made no attempt specifically to describe the 'things to be seized' as the Fourth Amendment requires" and expressed the view that the "Fourteenth Amendment makes the Fourth Amendment applicable to the States to the full extent of its terms." See *Ker* v. *California,* 374 U. S. 23, 30–34, 44–53. The principal opinion referred in more general terms to a number of aspects of the Missouri procedures. It pointed out (pp. 731–732) that "the warrants [had] issued on the strength of the conclusory assertions of a single police officer, without any scrutiny by the judge of any materials." The warrants (pp. 732–733) "gave the broadest discretion to the executing officers; they *merely repeated the language of the statute* and the complaints, *specified no publications,* and *left to the individual judgment of each of the many police officers* . . . the selection of such magazines as in his view constituted 'obscene . . . publications' " (emphasis supplied). There was slight "realistic expectation that the obscene might be accurately separated from the constitutionally protected. . . . [The officers] were provided with no guide to the exercise of informed discretion, because there was no step . . . before seizure designed to focus searchingly on the question of obscenity. . . . [T]hat only one-third of the publications seized were finally condemned strengthens the conclusion that discretion to seize allegedly obscene materials cannot be confided to law enforcement officials without greater safeguards . . . . Procedures which sweep so broadly and with so little discrimination are obviously deficient in techniques required by the Due Process Clause of the Fourteenth Amendment to prevent erosion of the constitutional guarantees."[11]

---

[11] The opinion of the court concluded (p. 738), "We have no occasion to reach the question of the correctness of the finding that the publications are obscene. . . . Since a violation of the Fourteenth Amendment infected the proceedings, in order to vindicate appellants' constitutional rights the judgment is reversed, and the cause is remanded . . . ."

The *Marcus* case was a step in a proceeding for condemning objectionable material (in some respects like the type of forfeiture action permitted by G. L. c. 276, § 3 [as amended through St. 1957, c. 660, § 3] and § 4), whereas the present case is a criminal prosecution, growing out of a warrant which might equally well have led to forfeiture action, as, indeed, the *Marcus* warrant might have led to criminal proceedings. The practical effect of the general warrant in both situations was the same and there was in each situation "no step . . . before seizure designed to focus . . . on the question of obscenity" (367 U. S. at 732). See Mr. Justice Harlan, dissenting, *Bantam Books, Inc.* v. *Sullivan*, 372 U. S. 58, 80. Cf. *Kingsley Books, Inc.* v. *Brown*, 354 U. S. 436, 441–444; *Times Film Corp.* v. *Chicago.* 365 U. S. 43, 49–50. The exhibition of four items to the clerk did not lead to any adequate definition in the warrant of what might be seized.

Although the principal opinion in the *Marcus* case discusses the inadequacy of several aspects of the Missouri procedures as applied in that case, we think that the basic ground of decision was that stated at p. 732 (already quoted) dealing with (a) the "broadest discretion" given by the warrants and (b) the circumstance that the warrants "merely repeated the language of the statute and the complaints" and specified no publications. This view is consistent with established principles of Massachusetts law, for comparable breadth of language in a warrant was condemned nearly 110 years ago by Chief Justice Shaw in *Fisher* v. *McGirr*, 1 Gray, 1, 21, 27–31, which like the *Marcus* case (at p. 728) relied to some extent on *Entick* v. *Carrington*, 19 How. St. Tr. 1029. See *Commonwealth* v. *Spofford*, 343 Mass. 703, 705. See also *Giles* v. *United States*, 284 Fed. 208, 215 (1st Cir.).

When he heard the motions to suppress in this case, the judge had before him in substance only the broad language[12]

---

[12] The warrant is made, perhaps, even more general and indefinite by including the words, "manifestly tending to corrupt the morals of youth," which (even if otherwise adequately definite) might permit seizure of material not "obscene" in a constitutional sense. See *Butler* v. *Michigan*, 352 U. S. 380,

of the warrant and the fact that a search had been made which had produced documents of a character likely to be offered in evidence at the trial of the indictments. Nevertheless, the warrant in terms and on its face left too much "to the individual judgment of . . . police officers" and a foreseeable consequence was that an unguided, unreasonable search would ensue. Because this illegal generality was apparent from the warrant itself, application of the principle of the *Marcus* case required the suppression of the seized evidence.

The evidence at the trial (which, of course, was not before the judge who heard the motions) dealt to some extent with the search. That evidence does not suggest that the procedure followed was more likely to prevent an unreasonable search than the Missouri procedure discussed in the *Marcus* case.

For some months police officers had been purchasing magazines similar to those seized. Officer Arthur Kelley went on December 2, 1960, with a warrant, to a shop known as Sonny's Cigar Store and seized from a display rack copies of the three magazines and one book covered by the indictments under c. 272, § 28B. The owner testified that he had purchased these from Interstate (with which he had done business for several years) without specifying the subject of the purchase by title and quantity.

Captain Blake of the police department had told Detective Condon to meet Officer Kelley at Sonny's, get some magazines from him, and then "go over to the West Roxbury District Court and show it [*sic*] to the clerk and get a search warrant." Detective Condon went to the court and obtained the search warrant. Then he, accompanied by De-

---

382–383. Obviously, the view that we take requires greater precision in framing warrants, particularly those relating to documentary material. We assume that the standards of the *Marcus* case will be met if each item to be seized is so adequately described by the issuing magistrate (as, for example, by title, specific description, in terms of close resemblance to a specific sample, or by an intelligible statement of the subject matter and inherent characteristics of the documents) that, in the circumstances, there will be minimum danger of the seizure of material not obscene. No such precautions were taken in this warrant.

tective Murphy, went with the warrant to Interstate's office at 1080 Hyde Park Avenue, under instructions to "see if there . . . [were] other magazines similar to the one" Officer Kelley handed to him, "and other magazines and books."

They handed the warrant to Jacobs, who read it. Condon asked Jacobs whether he had "obscene magazines in . . . [his] whole shop," and Jacobs replied, "No, the only obscene magazines I have are here, those magazines." The detectives showed Jacobs three magazines and "asked him if he had any of this type of magazine in this shop." Jacobs replied, "The stuff you are looking for is over there." Jacobs was asked if he "ever had a chance to read any of these girly magazines," and he answered that he had "looked them over." When asked whether he "would . . . allow . . . [his] kids to read these magazines," he replied, "If I ever saw any of my kids with any of these . . . I would break their backs." Thereafter, certain magazines were seized and taken from the store in trucks, including some cartons of magazines returned by customers.

"[A] great deal more [material] than . . . [was] introduced" in evidence was seized, including other books. Detective Condon "would look at them . . . make notes . . . call the captain, inform him of the book, the wording in the book. . . . [The captain] would ask . . . how many were there. . . . [Detective Condon] informed him. [The captain said,] 'Bring them in.'" Detective Condon "couldn't honestly say" how many cartons or packages of books had been taken, "whether it was 10, 100, [or] 200." He himself "personally examined possibly three or four magazines and possibly two or three book forms." Books "other than those . . . examined" were seized because Jacobs pointed them out. Detective Condon talked to the captain five to ten minutes on the telephone the first time and called him four or five times in all, sometimes reading to him excerpts from the material. Although the captain said to "bring them all in," it was "practically left to . . . [Detective Condon's] judgment based upon the magazines" seized at Sonny's.

The differences (mentioned in the dissenting opinion) between the search and applicable procedures in this case and those in the *Marcus* case do not seem to a majority of this court to be significant. The warrant, even if issued by the clerk of the District Court after examining the three magazines and book seized at Sonny's, made no reference to those items and gave the officers no specific guidance. The examination of the material seized at 1080 Hyde Park Avenue and the telephone consultation with the police captain afforded no greater safeguards than did the searches condemned in the *Marcus* case.

The Commonwealth contends that here the officers did not need a warrant, "because . . . they had reasonable ground for believing that a felony was being committed . . . at 1080 Hyde Park Avenue," so that "they might have gone there without a warrant to arrest and seize incidental to that arrest the very material sought to be suppressed." A reasonable search without a warrant may be made incidental to an arrest. *United States* v. *Rabinowitz,* 339 U. S. 56, 60. *Abel* v. *United States,* 362 U. S. 217, 234–238. See *Commonwealth* v. *Laudate,* 345 Mass. 169, 173. Cf. *Commonwealth* v. *Holmes,* 344 Mass. 524, 525. The *Rabinowitz* case, however, points out (p. 60) that "a search without warrant incident to an arrest is dependent initially on a valid arrest." The record does not indicate (see fn. 6, *supra*) that Jacobs was arrested on December 2, 1960.[13] The search and all that transpired at 1080 Hyde Park Avenue appear to have been pursuant solely to the authority of the warrant. We do not consider this to have been a search incident to an arrest.

Two further matters must be considered. (1) Specific objections to introduction of the illegally obtained evidence on the grounds stated in the prior motions to suppress, were not made when the evidence was offered at the trial,

---

[13] The Commonwealth's brief states merely that on "December 16, 1960, the defendants were brought before the Municipal Court of the West Roxbury District and were bound over for the Grand Jury." Copies of the original papers in the District Court, obtained under G. L. c. 231, § 135 (as amended through St. 1960, c. 171), and c. 278, § 33, indicate no arrest.

although at the outset of the trial counsel asked leave to renew the motions previously denied. In the circumstances renewed objections at the trial would have been entirely appropriate, but they were not necessary (particularly where they would have been wholly ineffective prior to the *Mapp* case) to preserve the defendants' rights already saved by exceptions to the denial of the motions to suppress. *Waldron* v. *United States,* 219 F. 2d 37, 40–42 (Ct. App. D. C.). See *Cogen* v. *United States,* 278 U. S. 221, 223–228; Maguire, Evidence of Guilt, § 5.08, pp. 233–237; 8 Wigmore, Evidence (McNaughton rev.) § 2184a, p. 41. See also *Page* v. *United States,* 282 F. 2d 807, 813 (8th Cir.); *S. C.* 359 U. S. 116. Cf. *Lawn* v. *United States,* 355 U. S. 339, 350–355 (conscious waiver of objection). Cf. also *Dirring, petitioner,* 344 Mass. 522, 523–524 (where there were no exceptions at any stage based upon the principles of the *Mapp* opinion); *United States* v. *Koenig,* 290 F. 2d 166, 170–174 (5th Cir.), affd. sub nom. *DiBella* v. *United States,* 369 U. S. 121. Defense counsel could reasonably rely upon their earlier exceptions to a ruling on motions which adequately presented the principles later upheld in the then undecided *Mapp* and *Marcus* cases.

(2) If Jacobs coöperated with the searching police, that is not significant. He was shown the warrant when the police first entered Interstate's premises. He was thus "in no environment to make a free choice" and the "questioning . . . received impetus" from the illegal warrant. Any coöperation, as well as the results of the questioning, were "branded with the initial taint." *Commonwealth* v. *Spofford,* 343 Mass. 703, 707–708. See *Takahashi* v. *United States,* 143 F. 2d 118, 122 (9th Cir.); *United States* v. *Arrington,* 215 F. 2d 630, 635–636 (7th Cir.). See also *Wong Sun* v. *United States,* 371 U. S. 471, 482–488, 498 et seq.; *Hobson* v. *United States,* 226 F. 2d 890, 894 (8th Cir.). Cf. *United States* v. *Page,* 302 F. 2d 81, 83–86 (9th Cir.); *Gilbert* v. *United States,* 307 F. 2d 322, 325–326 (9th Cir.)

The publications seized at 1080 Hyde Park Avenue were admitted in evidence generally, apparently with respect to

Commonwealth *v.* Jacobs.

all counts of all of the indictments. This was prejudicial
even as to counts not dealing with the illegally seized mate-
rial. All the judgments must be reversed. Judgment is
to be entered for the defendants upon all counts which
do not relate to the four publications seized at Sonny's
(not shown to have been obtained by any illegal search).
Whether the counts relating to these four publications can
be prosecuted without relying upon evidence obtained by,
or during, the illegal search is not certain upon this record.
In any further proceedings, of course, consideration should
be given to decisions rendered since the first trial (fn. 5,
*supra*).[14]

The judgments are reversed and the cases are remanded
to the Superior Court for further proceedings consistent
with this opinion.

*So ordered.*


KIRK, J. I am unable to join in the opinion of my es-
teemed colleagues. The far reaching effect of the opinion
and the sensitivity of the subject matter prompt me to dis-
cuss with particularity the principal points of disagree-
ment.

1. The first is the interpretation of the *Marcus* case. I
respectfully suggest that the *Marcus* case does not stand
for the proposition that a search warrant aimed at the
prosecution of a dealer in, or an exhibitor of, obscene mate-
rial is invalid because the allegedly obscene material is not
specifically identified in the warrant. In making this ob-

---

[14] Other recent authorities bearing upon various issues discussed in the briefs
may prove of importance in further proceedings. See *Yudkin* v. *State*, 229
Md. 223, 227–230; *Levine* v. *Moreland*, 229 Md. 231, 237. Cf. *People* v. *Finkel-
stein*, 11 N. Y. 2d 300, 305, 306, 307, 309, cert. den. sub nom. *Finkelstein* v.
*New York*, 371 U. S. 863; note, 76 Harv. L. Rev. 1498. For recent cases deal-
ing with publications somewhat similar to those referred to in the indictments,
see *Excellent Publications, Inc.* v. *United States*, 309 F. 2d 362, 364–365 (1st
Cir.); *In re Louisiana News Co.* 187 F. Supp. 241 (E. D. La. 3 judge court);
*People* v. *Richmond County News, Inc.* 9 N. Y. 2d 578, 586–588. See also *Fly-
ing Eagle Publications, Inc.* v. *United States*, 273 F. 2d 799, 803 (1st Cir.).
Cf. *Monfred* v. *State*, 226 Md. 312, 323–324 (and dissent, pp. 324–339), cert.
den. sub nom. *Monfred* v. *Maryland*, 368 U. S. 953. Cf. also *State* v. *Jacobel-
lis*, 173 Ohio St. 22, prob. juris. noted, sub nom. *Jacobellis* v. *Ohio*, 371 U. S.
808. *People* v. *Smith*, 31 U. S. Law Week 2227 (Appellate Department, Su-
perior Court of California, October 24, 1962), cert. granted sub nom. *Smith* v.
*California*, 373 U. S. 901.

servation it is pertinent to point out that the Supreme Court of the United States as recently as March 25, 1963, in a per curiam opinion (*Bush* v. *Texas,* 372 U. S. 586, 590) said, "We observe that, as a rule of consistent application, 'this Court has declined to anticipate a question of constitutional law in advance of the necessity of deciding it' *Peters* v. *Hobby,* 349 U. S. 331, 338." It is with this caveat in mind that the applicability of the *Marcus* case should be considered. It is also appropriate to note that Mr. Justice Brennan in writing for the majority uses cautious and guardedly circumscribed language. In at least seven different instances, in reference to the Missouri procedures, there appears the phrase, "as applied in the particular case," or its equivalent.[1]

It seems to me important, therefore, that due consideration be given to the nature of the proceeding involved in the *Marcus* case. The proceeding was an in rem proceeding, the purpose of which was the destruction or condemnation of allegedly obscene books. In dealing with the motions to suppress, the court said at p. 723, "[*W*]*e are concerned only with the challenge to the application of the procedures in the context of the protections for free speech and press* assured against state abridgment by the Fourteenth Amendment" (emphasis supplied). Thus, the question presented to, and resolved by, the Supreme Court of the United States was, as stated in the first sentence of the opinion, p. 718, whether the application in the case before it of Missouri's statutory procedures for the search and seizure of alleged obscene publications, preliminary to their destruction if later found by a court to be obscene, constituted a denial of due process of law under the Fourteenth Amendment. The court pointedly noted that the procedures under consideration "are separate from and in addition to the State's criminal statutes" (p. 718, fn. 1). The limited nature of the issue under review was again emphasized and defined in the first sentence of Part II of the opinion which states, p. 729: "The question here is whether

[1] 367 U. S. 717 at 718, 721, 723 (2), 729, 731 (2).

the *use* by Missouri *in this case of the* search and seizure
*power to suppress obscene publications involved abuses
inimical to protected expression"* (emphasis supplied).
Viewing the Missouri procedures as applied in the particu-
lar case, the court held, and correctly, as I think we agree,
that the requirements of due process under the Fourteenth
Amendment had not been observed. *Direct police action*
against the books themselves, involving the indiscriminate
seizure of 11,000 copies of 280 publications in six different
places by different officers who had no guide before seizure
to focus searchingly on the question of obscenity, *had ac-
complished the objective which only the judicial process
was competent to achieve,* namely, the suppression of the
allegedly obscene publications.   Therein lay the denial of
due process of law which was the issue before the court.
The single initial step of mass seizure under a general war-
rant, without judicial scrutiny, had effectively suppressed
the printed matter, two thirds of which was later judicially
determined not to be obscene.   The constitutional guaranty
of freedom of expression was thereby infringed.   I think
it should be noted, especially, that the majority of the Su-
preme Court of the United States do not rest their opinion
on the ground that the warrants used were general war-
rants, nor do they condemn the use of general search war-
rants in all proceedings.   Rather, the majority in the *Mar-
cus* case say that the use of the warrants in the in rem
proceeding (for the purposes of suppression or condemna-
tion) tended to infringe upon the constitutional right to
free expression because of the inadequacy of the safeguards
*"leading to their issuance and surrounding their execu-
tion"* (p. 731) (emphasis added).

The court expressly reaffirmed its basic holding in *Roth*
v. *United States,* 354 U. S. 476, 485, that "obscenity is not
within the area of constitutionally protected speech or
press," but insisted that the means used to effect the sup-
pression of obscenity be accomplished by due process of
law.

2.   The proceeding before us, unlike the *Marcus* case, is
not an in rem or condemnatory proceeding.   It is a pro-

ceeding in personam, a criminal prosecution, the objective of which is not the suppression or burning of books, but rather the punishment under our laws of purveyors of pornography or of others who traffic in obscene printed, photographic or other material. There is here no question that the fundamentals of due process were not observed. Here police action did not forthwith produce the result sought to be achieved in a criminal trial, namely, the conviction and punishment of the offender. Here, following the seizure of the publications *as evidence* by the police, the defendants were complained of, were represented by counsel, recognized on bail, bound over to the grand jury, indicted by the grand jury, arraigned, tried before a petit jury, and by the verdicts found guilty as to each count. Sentence was imposed, an appeal was taken, and execution of the sentence was suspended pending appeal. It is respectfully submitted that it cannot be said that the defendants who here are the objects of the proceedings have been denied due process of law.

3. The issue is narrowed, it seems to me, to the question whether the seizure made at 1080 Hyde Park Avenue was unreasonable. The court holds that the seizure was unreasonable because the warrant under which the police acted, although covering obscene printed matter in general terms, was a general warrant, and relies upon the *Marcus* case as authority for the proposition that a general search warrant is per se invalid. It then invokes *Mapp. v. Ohio,* 367 U. S. 643,[2] to make the proposition applicable to the case before us. I find in the *Marcus* case no authority for

---

[2] It is by no means certain that the *Mapp* case requires that State courts adhere to the fixed formulae of the Federal courts to guard against unreasonable searches and seizures so long as the State procedures themselves are not repugnant to the Constitution. Some of the courts of our sister States have so held. See, for example, *Commonwealth* v. *Bosurgi,* 411 Pa. 56, and *People* v. *Mickelson,* 59 Cal. 2d 448. In *Ker* v. *California,* 374 U. S. 23, 31–32, the Supreme Court of the United States, speaking through Mr. Justice Clark, the author of the *Mapp* opinion, said: ''Mapp . . . established no assumption . . . of supervisory authority over state courts . . . and . . . implied no total obliteration of state laws relating to . . . searches in favor of federal law. . . . [I]t recognized . . . that, 'at any rate, ''[r]easonableness is in the first instance for the [trial court] . . . to determine,'' ' . . . thus indicating that the usual weight be given to findings of trial courts.''

the general proposition which the court asserts except, as already noted, in the limited context of the particular in rem proceeding which was there under review.

It is, of course, clear that Justices Black and Douglas in their joint concurring opinion in the *Marcus* case rest their conclusion on the sole ground that the police acted under general warrants in violation, as they assert with finality and absolutism, of the Fourth and Fourteenth Amendments. That the two latter Justices felt impelled to advance this separate concept as the independent reason for their concurrence in the result clearly indicates to me that the majority were not of like mind and did not consider the single fact that the seizures were made under general warrants an adequate basis for the disposition of the case.

Accordingly, it would seem that my esteemed colleagues, in basing their opinion solely on the fact that the warrant in the case before us was general, have adopted as their own the view of the minority of the Supreme Court. *The result is that the minority view of the Supreme Court of the United States in an in rem proceeding is now incorporated into the law of this Commonwealth in a criminal prosecution.* On that premise it is ruled that the pre-trial judge in the case before us should have suppressed the evidence out of hand and solely on the basis that the warrant under which the seizure was made was a general warrant. The detailed recounting by Mr. Justice Brennan, speaking for the majority, of the actions of the police under the Missouri procedures extrinsic to the recitals on the face of the warrants, would seem to preclude, a fortiori, so simple a solution to the case before us. Moreover, I find it somewhat incongruous that this court while holding on the one hand that the pre-trial judge should have suppressed the evidence solely on the ground that a general warrant is per se invalid, should on the other hand cite as reasons for its holding several evidential facts developed during the trial which were unknown to, and not represented to, the pre-trial judge. Furthermore, the matters developed during the trial, which now are advanced as additional bases

for the opinion, were not the grounds of any motion made during the trial to suppress or to strike the evidence seized under the warrant.

Since I do not concede that the question is foreclosed by the *Marcus* case, I return to what I deem to be the basic question in the case before us, i.e., whether on the record it must be said that the seizure at 1080 Hyde Park Avenue was unreasonable. Quite recently Wilkins, C.J., speaking for this court in *Commonwealth* v. *Berwick, ante,* 5, 8, citing our own and Federal cases, noted that although ''In the area of reasonable searches and seizures, the Federal law is paramount . . . Federal decisions are not always consistent. . . . 'There is no formula for the determination of reasonableness. Each case is to be decided on its own facts and circumstances.' *Go-Bart Co.* v. *United States,* 282 U. S. 344, 357.'' This observation is still valid,[3] and should apply here. It seems to me that, although the procedures which should be followed in an in rem proceeding are not here applicable, there are nevertheless interesting and significant points of contrast, bearing on the question of reasonableness, between the facts of the case before us and the facts of the *Marcus* case and other cases cited by this court in the opinion. In the *Marcus* case no copy of any publication was shown to the magistrate who issued the general warrant (p. 722). In our case it appears that the material taken at Sonny's (which had been received by Sonny's from the defendants) was displayed to the clerk of court who is empowered by statute to issue the search warrant. In the *Marcus* case the determination as to the obscenity of the publications seized at the six different locations was left to the individual judgments of the many police officers engaged in ''the one-day foray.''[4] In our case a detective, with a single warrant describing a single location, acted in close coördination with, and under the direct supervision of, the captain of his division in the

[3] See *Ker* v. *California,* 374 U. S. 23, 33.

[4] See *Bantam Books, Inc.* v. *Sullivan,* 372 U. S. 58, dissent by Harlan, J., who was of the majority in the *Marcus* case.

exercise of a tentative judgment as to what was obscene, as is indicated by the duration and frequency of the telephone calls between them while the detective was on the defendants' premises. In addition the detective had in his possession the magazines obtained at Sonny's as specimens or guides as to the type of printed matter covered by the warrant. More important were the statements made by Jacobs. They were made before any seizure took place. They were admissions that he had magazines which were the same as, or similar to, those obtained at Sonny's; that he had other magazines whose contents were known to him; and that he was aware of their obscene nature in that he would "break . . . [the] backs" of his own children "in their twenties" if he saw them in their possession. The books taken by the police, in addition to those examined by the police, were taken because Jacobs, before any books were seized, pointed them out and said, "You want them, too." The opinion, citing *Commonwealth* v. *Spofford*, 343 Mass. 703, 707–708, rules that these statements are inadmissible. This ruling is disconcerting. Fidelity to the facts of the two cases as I read them should repel the rulings. In the *Spofford* case, the police without any warrant and in the absence of the defendant had made a search of his apartment dwelling and seized certain pornographic material. Later, when the defendant appeared at his apartment, he was requested to accompany the officers to the police station. At the police station, in the course of an examination by still other officers on the *basis of the illegally obtained material,* he disclosed the existence of additional material similar to that seized without a warrant. We held that in these circumstances Spofford "was in no environment to make a free choice," and that the "acquisition [of the second lot] was branded with the initial taint" of illegality of the first seizure and was inadmissible. 343 Mass. at 707–708. That situation, it seems to me, is in stark contrast to the situation before us. Jacobs's statements to the police were not an "offshoot of the original unreasonable search and seizure," because no

search and seizure of any kind had been made prior to his statements. There was no "initial taint" to "brand" the *subsequent* acquisition, since there had been *no prior* seizures. The only seizure which was made occurred after Jacobs's statements. Nor does it appear to me that there was any oppressive "environment." I submit that Jacobs's statements would have been admissible if made to a civilian, and that they would have been admissible if made in similar circumstances to a police officer without a warrant. The implicit ruling of the opinion appears to be that the same statements, made before seizure to a police officer with a general warrant covering obscenity who makes no arrest, become inadmissible. I find it difficult to justify a finding of unreasonableness, and, upon that finding to predicate a ruling of inadmissibility from such a trivial departure by the police from the formal niceties of protocol which the opinion establishes. As Mr. Justice Clark aptly said, "There is no war between the Constitution and common sense." *Mapp* v. *Ohio,* 367 U. S. 643, 657. The record, as I read it, shows nothing in the conduct of the police which shocks the conscience or offends the sense of justice as there was in the *Mapp* case where the court, among other factors, cited the forcible entry of the dwelling, the physical violence against the female defendant, and the indiscriminate ransacking of the dwelling, and expressed, in addition, serious doubt that the officers had any warrant whatever. In contrast, the peaceable entry which was made of Jacobs's place of business during business hours, the utter absence of offensive conduct, and the fact that he was not arrested, although he lawfully could have been, suggest reasonableness rather than unreasonableness in the entire course of conduct by the police.

I offer the further observation that in *Fisher* v. *McGirr,* 1 Gray, 1, cited in the opinion, Shaw, C.J., dealt with a statutory in rem proceeding and an in personam proceeding which was purely ancillary thereto, in both of which the fundamentals of due process of law were plainly lacking. It is clear authority for the *Marcus* case. Its pertinency to

the case at bar seems questionable. The procedures which have been sanctioned by this court in criminal prosecutions in the last century (of which *Commonwealth* v. *Wilkins,* 243 Mass. 356, cited in the opinion, is an example) would seem to refute the anachronistic application which the opinion now makes of *Fisher* v. *McGirr.*

I have no doubt that the number of copies of a particular publication seized in a given case is a relevant factor to be considered in determining whether the seizure was unreasonable. In a criminal prosecution it would seem that the number of copies seized should bear a fair relationship to the needs for trial as, for example, the preparation of the case including examination by experts (if needed), distribution to the grand jury, and later to the judge and trial jury. The seizure of a number clearly in excess of the needs for prosecution would be, as I see it, an unreasonable seizure involving the question of due process of law, similar to the *Marcus* case, inasmuch as it would tend to accomplish by a criminal prosecution the function reserved to an in rem proceeding under proper safeguards. There was here no showing that, as to any particular publication, the number of copies seized was excessive. Nor was the single motion to suppress based on an averment to that effect.

4. Lest failure to comment on other statements in the opinion be construed as acquiescence, I must persevere. The opinion states: "The publications seized at 1080 Hyde Park Avenue were admitted in evidence generally, apparently with respect to all counts of all of the indictments. This was prejudicial even as to counts not dealing with the illegally seized material. All the judgments must be reversed." This impresses me as novel doctrine. It does not appear that any request was made by the defendants to limit the applicability of the publications introduced as evidence. Our cases have consistently held that a limitation on the effect of evidence to a particular count or to a particular defendant must be as the result of an objection or request. *Commonwealth* v. *Giacomazza,* 311 Mass. 456, 468, and cases cited. More importantly, it does appear affirma-

tively from the record that it was agreed that twenty-one of the twenty-five publications could be admitted in evidence as those seized at 1080 Hyde Park Avenue. The transcript shows that the objections which were made to the admission of the books in evidence were frivolous.[5] It further appears that each count of the indictments referred to a single named book, and that the jury returned a verdict as to each count. I suggest that a ruling of prejudice in these circumstances establishes a precedent of doubtful wisdom.

5. The reversal of the convictions on the counts relating to the publications seized at Sonny's is unsettling. The motion to suppress was limited to the material seized at 1080 Hyde Park Avenue. Neither by its terms nor by reasonable implication can it be said to extend to the publications seized at Sonny's. The latter were the subject of separate counts on which verdicts of guilty were returned. Notwithstanding this the court sua sponte reverses the judgments of conviction as to these counts. I can only say that I am at a complete loss to understand this disposition, except as the indirect result of the ground mentioned in the preceding paragraph, which I consider to be untenable.

6. Again having in mind the caveat in *Bush* v. *Texas* quoted earlier in this dissent, I venture constructively to suggest that the true rule to be deduced from the *Marcus* case is that, on a motion to suppress because of an alleged illegal search and seizure, a hearing be held and evidence received to determine from the whole course of the proceedings in the particular case whether there was an infringement of the defendants' constitutional rights. The *Marcus* case is itself an example of the observance of this practice. The hearing, as appropriate, could be a pre-trial proceed-

---

[5] The only objection to the admissibility of the four publications taken at Sonny's was on the ground that the publications were "Not properly identified as related to any issues in this case." Shortly thereafter, one Baker, the operator of Sonny's, testified that he had bought the four publications from Interstate and Jacobs and received them without an order from him specifying title and quantity. As to the order of proof, see *Commonwealth* v. *Eppich*, 342 Mass. 487, 494–495.

The only objection to the admissibility of the twenty-one publications taken at 1080 Hyde Park Avenue was on the ground that "It has not been testified these are sex magazines."

ing or, perhaps preferably, could be held during the course of the trial, either in the nature of a voir dire, or in the presence of the jury as the case may commend to the trial judge. For all practical purposes the latter method was followed in the case before us even though the defendants never properly raised the issue before the trial judge.

I definitely do not wish to be understood as favoring the promiscuous use of general search warrants, particularly when used preliminary to an in rem proceeding. On the other hand, there are circumstances especially in connection with criminal prosecutions when the use of a general warrant may be reasonable and proper. The case before us, on the facts disclosed, seems to me to be such a case. It could be found that the police reasonably considered that the defendants operated the premises at 1080 Hyde Park Avenue as a central distributing point for obscene printed matter in this area and that the publications obtained at Sonny's were typical of what would be found at the defendants' premises. The absolute holding of the opinion that a general search warrant is per se invalid in all cases for both in rem and in criminal cases is, I submit, not required by the *Marcus* case, and is unnecessary and unfortunate in this case. In general it forecloses at the threshold the orderly development, in accordance with our legal traditions, of an adaptable body of law in this potentially important field. In particular it here nullifies the laudable and, I believe, the legitimate efforts of law enforcement agencies to disinfect the sewers of smut which are the sources of a grave and growing social plague. It further foretells great difficulty in the prosecution, for example, of the stealthy distributors and exhibitors of obscene photographs and untitled reels of film which are an especially vicious form of pornography.[6]

For the reasons stated I decline to join in the opinion.

---

[6] In *Ker* v. *California,* 374 U. S. 23, 32, again in reference to the *Mapp* case, the court echoed the sentiments of *Elkins* v. *United States,* 364 U. S. 206, 222, "that in applying the Fourth Amendment this Court has seldom shown itself unaware of the practical demands of effective criminal investigation and law enforcement."