COMMONWEALTH *vs.* RONALD FISHER.

Hampden.    March 4, 1968. — June 26, 1968.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, KIRK, SPIEGEL, & REARDON, JJ.

*Evidence,* Admissions and confessions, Photograph. *Constitutional Law,* Assistance of counsel, Admissions and confessions. *Practice, Criminal,* Waiver, Assistance of counsel. *Waiver.*

Testimony in a murder case warranted findings that, after the defendant at the request of the police had voluntarily gone to a police station one morning some days after the murder, the full constitutional warnings required by *Miranda* v. *Arizona,* 384 U. S. 436, were understandably communicated to him that morning before an in custody investigation and its accusatory focus on him had begun, as well as again upon a continuation of the interrogation in the evening of the same day, and that by declining use of a telephone offered by the police and otherwise he affirmatively waived his right to have counsel present at his interrogation; and confessions obtained from him in the absence of counsel following the evening interrogation were not inadmissible as tainted with initial illegality in the morning [552–555]; CUTTER, J., concurring in the result; WHITTEMORE, J., dissenting.

Constitutional rights of a defendant indicted for the murder of a woman were not violated by the taking of photographs of scratches on his back and neck shortly after he was taken into custody and when he was without counsel and either before or after he was given the constitutional warnings, and there was no error in the admission of the photographs in evidence at his trial. [556]

INDICTMENT found and returned in the Superior Court on September 15, 1966.

A motion to suppress was heard by *Macaulay,* J., and the case was tried before him.

*Richard J. Rubin* of New York (*Edward N. Hurley* with him) for the defendant.

*Matthew J. Ryan, Jr.,* District Attorney (*Leonard E. Gibbons,* Assistant District Attorney, with him), for the Commonwealth.

SPIEGEL, J. The defendant was tried on an indictment which charged that on July 1, 1966, he "did assault and beat Carolyn Willis with intent to murder her, and by such assault and beating did kill and murder the said Carolyn Willis." The jury returned a verdict of guilty of murder in the first degree. The case was tried subject to G. L. c. 278, §§ 33A–33G, and is here by appeal.

We summarize pertinent portions of the evidence. The defendant was questioned by the Springfield police as one of several persons who had been at a party attended by the victim on the evening of the murder. At that time, the defendant denied any knowledge of the crime. Subsequently, the police discovered an inconsistency between the defendant's report and that of another person interviewed. The police left a telephone message at the place where the defendant was staying asking him to come to the police station on Monday morning, July 11, 1966. In response to this request, the defendant voluntarily came to the station. He arrived about ten or ten thirty in the morning and was interviewed by three police officers. One of these, Lieutenant Shea, testified on voir dire that, after reviewing the events of the party, he asked the defendant whether, after the victim's departure, he had borrowed a friend's automobile keys and left the party alone. The defendant denied this. Lieutenant Shea "told him we 'have information that you did.'" At "about the same time" Shea noticed "what appeared . . . to be . . . fingernail scratches on his neck," and asked the defendant about them. The defendant said they were scratches inflicted on the night of the party by a former girl friend. Shea said, "Have you got any more on you? Take off your shirt." The defendant did so, and the officers observed three more scratches on his back. At this point, Lieutenant Shea "stopped the interrogation and in-

formed him of the fact that he was a suspect," and "informed him of his constitutional rights." At the voir dire, Shea testified as follows: "I told him that he was entitled to be represented at all times by counsel. I told him that he could remain silent, and if he said anything it could be used against him, and I asked him if he would voluntarily take a lie detector test that day." Later in the voir dire, Shea testified that on the defendant's return from the lie detector test in the evening, "I informed him *again* of his right to an attorney, the fact that if he couldn't afford one, that he would be furnished with one . . ." (emphasis supplied). At the trial before the jury, Shea testified that in the morning "I told him that he was entitled to the services of an attorney. . . . [T]hat he had the right to a telephone, and an attorney would be furnished to him at the expense of the Commonwealth if he was not able to afford one. . . . I told him he had a right to remain silent and that anything he did say would be used against him if he chose to say anything to us." Either before or after these warnings were given, photographs were taken of the scratches on the defendant's neck and back. No further interrogation then took place. The defendant was taken to Boston, given a polygraph test, and then was returned to the Springfield police station about nine thirty or ten o'clock in the evening. On his return, the defendant was given further warnings. Lieutenant Shea described these on the voir dire as follows: "At this time I informed him again of his right to an attorney, the fact that if he couldn't afford one, that he would be furnished with one; his right to remain silent; and the fact that anything he said would be used against him. I also informed him of his right to the use of the telephone. I told him that he could use the phone to call friends, relatives or even engage an attorney if he so desired. He declined the use of the telephone." On cross-examination on the voir dire, Shea gave this version of the evening warning: "I said that, 'Ronald, you have a right to an attorney, an attorney can be present here now. You don't have to talk to us. If you do talk to us, anything you say will be used

against you,' and I said, 'there is a telephone, if you want to call anyone, call a lawyer, call any friend or for any reason, this is the telephone, go ahead and use it.' He declined. He said, 'No, I don't want to use the phone.' " Before the jury, Shea testified that after this conversation he asked the defendant, "[D]o you want to talk further with us about this case?" and the defendant replied, "I will." At the voir dire Lieutenant Shea testified that he told the defendant he had failed the polygraph test and that in his absence the police had interviewed his former girl friend and had determined that she could not have scratched him. The defendant said, "I know it's very bad for me. . . . [I]t looks very bad for me." The interrogation continued until about eleven o'clock, at which time the defendant confessed. About four o'clock of the following morning, the confession was reduced to writing and the defendant signed it. The defendant also made a sketch of the scene of the crime. The photographs, the oral and written confessions, and the sketch were admitted in evidence over the defendant's objections.

The defendant's principal assignments of error concern the denial of his motion to suppress this evidence on the ground that the police did not conform with the requirements set forth in *Miranda* v. *Arizona*, 384 U. S. 436. At the conclusion of the voir dire on the motion to suppress, the judge made the following findings: "[A]t the time when the suspicion of crime was focused upon the defendant, he was advised by the police that he had a right to remain silent, need not answer questions. He had a right to counsel and the services of counsel. And, Lieutenant Shea told him that if he couldn't afford one, that he would be furnished one. Anything he might say would be used against him and he could use the telephone to call friends, relatives or engage an attorney if desired. . . . [T]he oral statements made and the written statements . . . were voluntarily made by the defendant without threats or duress or promises, or inducements or hope, or favor of reward."

The defendant contends that the record of the voir dire

testimony does not support the judge's finding that the defendant was informed in the morning of his right to have counsel provided at the Commonwealth's expense. While Lieutenant Shea omitted this item in his original recitation of the warnings given in the morning, when he described the warnings given in the evening he said that he "again" advised the defendant of his right to counsel and of "the fact that if he couldn't afford one, that he would be furnished with one." From this testimony, the judge was warranted in determining that this portion of the warning was given in the morning. The correctness of this determination is borne out by Lieutenant Shea's testimony before the jury, recited above. We are of opinion that the warnings which the judge found were given to the defendant in the morning were in this respect in conformity with the rules set out in *Miranda* v. *Arizona*, 384 U. S. 436.

The defendant also contends that the morning warnings were not given before the commencement of the defendant's in custody interrogation, and that as a consequence the confessions obtained many hours later were tainted with an initial illegality. In *Escobedo* v. *Illinois*, 378 U. S. 478, 492, the Supreme Court of the United States held that the right to counsel attaches "when the process shifts from investigatory to accusatory — when its focus is on the accused and its purpose is to elicit a confession." In *Miranda* v. *Arizona, supra,* 477, it was said that an individual must be warned of his rights "when the individual is first subjected to police interrogation while in custody at the station or otherwise deprived of his freedom of action in any significant way." The defendant contends that the *Miranda* case modifies the "focus" rule of *Escobedo* v. *Illinois, supra,* by advancing the time when the right to counsel attaches (and warnings must be given) ahead of the point when the investigation becomes accusatory to the time when "custody" begins. As applied to the case at bar, there is no conflict between these two standards. Lieutenant Shea's interrogation of the defendant became an in custody interrogation at the point when Shea observed the scratches and the investigation "focused" on

the defendant.[1]  At this point the warnings were given. Until this time, there is nothing to suggest that the defendant, who voluntarily came to the station at the telephoned request of the police, was "in custody at the station or otherwise deprived of his freedom . . . in any significant way." We believe the warnings given to the defendant in the morning were timely.

The defendant further argues that he was not apprised of his right to have an attorney present at the interrogation. In *Miranda* v. *Arizona, supra,* it was held that "[A]n individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation." 384 U. S. at 471. Lieutenant Shea testified on the voir dire that he warned the defendant in the morning that "he was entitled to be represented at all times by counsel." Lieutenant Shea testified that on the defendant's return from Boston, he told him, "[Y]ou have a right to an attorney, an attorney can be present here now." The ability to understand verbal communication, of course, varies among individuals. We are convinced on this record, however, that the defendant's right to the presence of an attorney was understandably communicated to him. We have said that the "principles announced in the *Miranda* case must be applied reasonably and with common sense and do not constitute an arid, ritualistic formula to be administered inflexibly." *Commonwealth* v. *Wilbur*, 353 Mass. 376, 383. We believe that the reasonable import of the warnings given the defendant were sufficient to apprise him of his right to have an attorney present.

The defendant contends that there was no evidence that, even if adequate warnings were given, the defendant know-

---

[1] Lieutenant Shea testified on the voir dire as follows: Q. "He had been a suspect since 10:00 or 11:00 o'clock . . . [in] the . . . morning?" A. "That's correct." Q. "And is it fair to say, Lieutenant, that as a suspect, if he decided he was going to walk out and go back to New York, he wouldn't have been allowed to, would he?" A. "That's correct." This testimony does not suggest to us that the defendant was in custody at the time he arrived at the police station, but would have been restrained from leaving "as a suspect," i.e., after he became one.

ingly waived his right to have counsel present at the inter-
rogation. It was said in the *Miranda* case at 475 that a
"valid waiver will not be presumed simply from the silence
of the accused after warnings are given or simply from the
fact that a confession was in fact eventually obtained." In
the instant case, there is more evidence of waiver than the
simple silence of the defendant or the mere fact that he
confessed. In the morning, after the warnings were given
and the defendant declined the offered use of the telephone,
the defendant was asked if he would go to Boston and
undergo a polygraph test. Lieutenant Shea testified that he
said, "Now, before you can take this test, you've got to
sign a waiver of your rights in which you have been informed
of all your rights, and that you voluntarily took this test."
The defendant replied, "I will," and then went to Boston
and signed such a waiver. On his return, after again being
warned, the defendant was offered the use of the telephone
to call friends or an attorney. The defendant said, "No, I
don't want to use the phone." Immediately thereafter, he
was asked, "[D]o you want to talk further with us about this
case?" He replied, "I will." Within an hour the defendant
confessed. The record discloses affirmative actions on the
defendant's part in declining the offer of a telephone to
obtain counsel,[2] in agreeing to go to Boston and to sign a
waiver in regard to the polygraph test, and in expressing his
willingness to continue the interrogation after the evening
warnings. The facts reveal an affirmatively coöperative at-
titude on the defendant's part which presents an entirely
different case from the passive model from which the
Supreme Court in the *Miranda* case said a valid waiver will
not be presumed. We hold that the Commonwealth here
has sustained its burden in this regard.

We deal briefly with the defendant's other assignments of
error as they do not require any extended comment. The
defendant claims error in the refusal of the judge to instruct

---

[2] The record shows that the defendant had previously employed the services
of an attorney at his home in New York State, and that this same attorney
subsequently appeared in the defendant's behalf at the trial of the defendant
in Massachusetts.

the jury in his charge that the defendant was not informed of his right to have counsel present and to have counsel provided by the Commonwealth in the event that he could not afford one.   Our discussion above disposes of that issue. There was no error.   Nor was there an abuse of discretion in the judge's denial of the defendant's motion for a new trial.   There was no prejudice in admitting the written statement of the witness Dwight Walker in corroboration of his oral testimony.   There was no error in admitting the photographs of the scratches on the defendant's back and neck. It was not a violation of his constitutional rights to take the photographs.   *Schmerber* v. *California,* 384 U. S. 757.   In cross-examination a sixteen year old acquaintance of the defendant who was called by him testified that in the course of a conversation on the evening of the murder the defendant had asked her to have intercourse with him.   The denial of the motion to strike was within the judge's discretion, notwithstanding the risk of raising collateral issues.

We have reviewed the entire record and do not believe that justice requires us to grant a new trial or the entry of a verdict of a lesser degree of guilt.   See G. L. c. 278, § 33E, as amended by St. 1962, c. 453.

*Judgment affirmed.*


CUTTER, J. (concurring) I think that the ambiguous and somewhat contradictory evidence on the voir dire does not warrant the conclusion that Fisher (although warned of his right to remain silent and to be represented by counsel) was informed by the Springfield police on the morning of July 11, 1966, (a) that he could have counsel present at any police questioning, or (b) that, if he could not afford counsel, counsel would be provided for him at State expense.   Perhaps the *Miranda* case, 384 U. S. 436, 468–479, on the present record, must be inflexibly construed as requiring that Fisher's apparently truthful confession be excluded if less than the complete warning (prescribed by the majority opinion in that case) was given on the morning of July 11.   I perceive in the record no occasion for any warning until shortly after

Fisher's unsatisfactory explanation of the scratches upon his person. If the *Miranda* case must be inflexibly interpreted, Fisher's death sentence should be reversed, and the present case should be remanded for a new trial in which the record concerning the police investigation less than a month after the *Miranda* decision can be developed more clearly and fully. Understandably a more complete record was not thought necessary at the carefully conducted trial only about three months and a half after that decision.

The voir dire testimony warrants the following conclusions: (1) Fisher was given the complete *Miranda*-type warning and an opportunity to use the telephone on the evening of July 11. This was before any significant interrogation after his return to Springfield from Boston. There he and others (not like him suspected but only material witnesses) had taken polygraph tests after signing written waivers which are not before us. (2) No significant questioning (other than that involved in the polygraph test, not itself admissible in evidence, *Commonwealth* v. *Fatalo*, 346 Mass. 266) took place during the trip to Boston. (3) The police were attempting to comply fairly with requirements for custodial interrogation as they understood them. (4) Fisher proceeded coöperatively to answer police questions after each set of warnings. From his whole conduct, it could be inferred that he had decided to attempt by himself to allay police suspicions without asserting any rights of which he had been told.

It seems to me, in all the circumstances, that the voir dire evidence should be regarded as warranting the conclusion that there was substantial compliance with the purport of the *Miranda* decision. Cf. the *Westover* situation discussed in the *Miranda* case, 384 U. S. 436, 494–495. I do not think that this record discloses literal compliance.

I concur in the result.

WHITTEMORE, J. (dissenting) For the waiver to be made "knowingly and intelligently" as required by the *Miranda* rule, as to which the Commonwealth has the burden of

proof, it must be shown that an understandable statement of the rights was given (384 U. S. at 479). The statement was required at least as early as the discovery of the scratches. It is not determinative that the express confessions were made in the evening interrogations. The defendant's custody began about 11 A.M., some twelve hours before his oral confession, and in the course of the day and evening he proceeded gradually into a state of inescapable involvement. The question whether he would take a lie detector test was a part of the police interrogation and the test was undoubtedly a factor leading to the later confession.

The evidence, to me, does not permit the conclusion that in the morning the defendant was "clearly informed that he . . . [had] the right to consult with a lawyer and *to have* the lawyer *with him during* interrogation" (384 U. S. at 471) (emphasis supplied). Informing the defendant that he was entitled "to be represented at all times by counsel," "to the services of an attorney," and "to the use of the phone for the purpose of engaging an attorney" did not clearly inform him that he had a right to have the lawyer present at the police station and to consult with him before he answered any more questions. On the record it was only in the evening that the defendant was told that "an attorney can be present here now." It may be that the warnings given in the morning were as full as those given in the evening. Possibly in the use of the word "again" Lieutenant Shea intended so to state. But this possibility is not enough to establish compliance with the rule. Hence, I conclude that the judgment should be reversed.

The testimony (given by three officers and the defendant) at the voir dire did not permit the conclusion that it had been shown that the defendant had been told in the morning that an attorney would be provided if he could not afford one. Lieutenant Shea's testimony at the trial, as first given, also omitted this. It was only after a leading question which, although excluded, operated to call his attention to the omission, that the witness, in answer to a succeeding question, gave the testimony stated in the majority opinion.

The evidence is inconsistent and an unsatisfactory basis for a finding that the morning warning had been shown in this respect to be adequate.

A retrial would permit a determination to be made on evidence free of the present uncertainties and ambiguities.

In this case the police pressures were not undue, the guilt of the defendant is clearly established by his confession, and it may be that whatever was said to the defendant he would have continued to talk. I believe, however, that the *Miranda* rule, so long as it remains an applicable principle of constitutional law, must be applied as declared.